**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
MATTIE SCHONFELD,

                               Plaintiff,                        **Opinion and Order**

          -against-                              **21-CV-6053 (JW)**

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
------------------------------------------------------------------X

      Plaintiff Mattie Schonfeld brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for Social Security Insurance ("SSI") under the Social Security Act (the "Act"). Both Parties have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons stated below, Plaintiff's motion is **GRANTED** and the Commissioner's motion is **DENIED**.

## <u>BACKGROUND</u>

### A. <u>Procedural History</u>

      On October 17, 2017, Plaintiff submitted an application for SSI asserting disability based on bipolar disorder beginning October 8, 2016. <u>See</u> Social Security Administration ("SSA") Administrative Record (Dkt. No. 10) (hereinafter "R. __") at 96. The claim was initially denied on March 21, 2018. R. at 21. On May 18, 2018, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), R. at 109, which took place on February 26, 2020, in front of ALJ Vincent Cascio. R. at 76.

      In a written decision dated March 17, 2021, the ALJ found that Plaintiff was not disabled as defined under the Act. R. at 33. Plaintiff subsequently requested

Appeals Council Review.  R. at 237.  The Appeals Council denied that request on June 23, 2021, rendering the ALJ's decision final.  R. at 1.  Plaintiff brought this action on March 10, 2022, contending (i) the ALJ committed legal error by making a residual functional capacity ("RFC") determination contrary to Social Security Ruling 85-15; (ii) the ALJ committed legal error by making an RFC determination in the absence of supporting expert medical opinion; (iii) the ALJ failed to fulfill his duty to assist Plaintiff in developing the record, (iv) the ALJ's RFC and credibility findings were unsupported by substantial evidence, and (v) the ALJ did not properly weigh the medical opinions.  Memo. of Law in support of Pl.'s Mot. for Judgment on the Pleadings at 8-15 (Dkt. No. 13) ("Pl. Mem.").  Plaintiff seeks remand for approval and calculation of benefits, or for further administrative proceedings.  Id

### B. <u>Personal Background</u>

Ms. Schonfeld was born on January 14, 1976.  R. at 81.  Ms. Schonfeld's highest level of education was a high school diploma.  R. at 82.  Ms. Schonfeld's non-continuous employment history consisted of working as a teacher of eighth grade history, as an office worker, and as a shopper.  R. at 100.  She stopped working in 2014 due to phobias.  R. at 82-83; 100.  Ms. Schonfeld has a long history of treatment for bipolar disorder, depression, and schizoaffective disorder with "long term out[patient] as well as inpatient care with multiple admissions" with suicide attempts.  R. at 326; <u>see also</u> R. at 345; 355; 366; 379; 392; 409.

Ms. Schonfeld is divorced and lives with her adult son, who has special needs. R. at 81-82.  Ms. Schonfeld's daughter, who has been diagnosed as having borderline

personality disorder, lives nearby.  R. at 412; 1065; 415.  Ms. Schonfeld has a good relationship with her parents and sister.  R. at 84-85.  She also has a brother with "mental health concerns," though the extent of her relationship with him was not explored in the record.  R. at 363; 1070.

## C. Plaintiff's Relevant Medical History

Plaintiff has an extensive medical history, which is separated below into pre- and post-2016, when Plaintiff's disability began.

### a. Treatment Prior to the Relevant Period

Over the course of six years from 2003 to 2009, Ms. Schonfeld was admitted to Four Winds Hospital seven times for various mental health reasons.  R. at 335; 345; 347; 359; 378; 382; 408.  Ms. Schonfeld's treatment at Four Winds Hospital began on August 24, 2003, when she was transferred from Maimonides Hospital for suicidal ideation with plans. R. at 325.  Ms. Schonfeld was stabilized and discharged on September 4, 2003 but was readmitted on December 3, 2003 after experiencing an exacerbation of bipolar symptoms upon separation from her husband.  R. at 335; 345. During the readmission, she was diagnosed with schizoaffective disorder.  R. at 345. Ms. Schonfeld was again hospitalized from June 3, 2004 to June 10, 2004 due to psychosis.  R. at 347; 355.

Subsequent hospitalizations resulted from a series of intentional prescription medication overdoses: Ms. Schonfeld was hospitalized from June 14, 2004 to June 30, 2004 after an overdose on clonazepam and alprazolam, R. at 359; 366, from July 24, 2006 to August 4, 2006 after an overdose on clozapine, R. at 378-379, and from

September 18, 2007 to September 26, 2007 after an overdose of prescription medication. R. at 382; 391-392. Ms. Schonfeld was again hospitalized from October 2, 2009 to October 23, 2009 for treatment of worsening depression and paranoid ideation. R. at 408-409.

### b. <u>Treatment During the Relevant Time Period</u>

#### i. Sandra Lowe, M.D.

Dr. Sandra Lowe has provided Ms. Schonfeld with psychiatric care for Bipolar I D/O, severe, with psychotic features since July 2000. R. at 1064. In a Psychiatric Summary dated February 23, 2018, Dr. Lowe stated that Ms. Schonfeld has had more than ten hospitalizations due to recurrent manic/depressive/psychotic episodes between 2000 and 2009 but that Ms. Schonfeld currently attends appointments for pharmacologic management and supportive therapy every four to six weeks. <u>Id</u>. Dr. Lowe noted that for the six months prior to the report, Ms. Schonfeld had been adherent to appointments and medications and had not experienced manic episodes, psychotic symptoms, nor suicidal ideation. <u>Id</u>. Ms. Schonfeld's relevant medications included clozapine, topiramate, zolpidem, and clonazepam. R. at 1065.

However, Dr. Lowe observed that Ms. Schonfeld had many episodes of acting impulsively and with poor judgment. R. at 1066. In addition, Ms. Schonfeld's mood had been labile, intermittently anxious and dysphoric, with stressors including caring for her son, conflicts with her daughter, and financial difficulties. R. at 1064. Dr. Lowe noted that Ms. Schonfeld lived in her own home with her two children but was unemployed. R. at 1064. Dr. Lowe opined that Ms. Schonfeld "has been totally

4

disabled due to her severe illness and has not been employed for more than a few weeks since age 19." R. at 1066. Though Ms. Schonfeld was able to live independently, Ms. Schonfeld depended on assistance from her family and hired help to care for her son and complete some household chores. Id.

Dr. Lowe stated that except for family, Ms. Schonfeld was socially isolated because her interpersonal functioning is impaired by paranoia that is easily triggered. Id. Moreover, Ms. Schonfeld's frustration tolerance was poor, she quickly became irritable, and had difficulty with concentration and following directions. Id. As a result, Dr. Lowe summarized Ms. Schonfeld's illness as "chronic, severe, and disabling." Id.

### ii.   Monsey Family Medical Center

The Record indicates that from at least August 23, 2016, Ms. Schonfeld had been seen by numerous health care providers at Monsey Family Medical Center for her medical and dental needs. R. at 420. From April 2018 to January 2019, Ms. Schonfeld regularly saw Rachma Friedenberg, LMSW, for psychotherapy sessions. R. at 446-469; 867-868; 966-967. On May 30, 2018, Ms. Friedenberg noted that Ms. Schonfeld was suffering from adjustment disorder with mixed anxiety and depressive disorder. R. at 448. From May 2018 to December 2019, Ms. Schonfeld was also under the care of Dr. Zvi Weisstuch, M.D. for medication management. R. at 446-469; 867-868; 966-967.

On April 20, 2018, Ms. Schonfeld reported to Dr. Inna Kremen, PA-C during her gynecological visit that she had a good energy level and was sleeping well. R. at

440.  Ms. Schonfeld reported sleeping six hours per night.  <u>Id</u>.  During a review of systems, Dr. Kremen found no indications of anxiety, changes in sleep pattern, depression, inability to concentrate, or insomnia.  R. at 441.

Arthur Kharonov, NP, saw Ms. Schonfeld for prescription refills on December 24, 2018, including treatment of hypothyroidism.  R. at 466-467; 794.  Mr. Kharonov noted that Ms. Schonfeld's affect and speech were both normal.  R. at 466-467; 794.  During Mr. Kharonov's review of systems, he did not notice any mood changes in Ms. Schonfeld.  R. at 466; 793.

On September 5, 2019, while visiting Dr. Debra Arbisser-Grohman, M.D. for a rash, Ms. Schonfeld reported a phobia to showering and admitted only taking a bath one to two times per week.  R. at 877-878.

### iii.   Good Samaritan Hospital

On October 23, 2017, Ms. Schonfeld presented to the emergency department of Good Samaritan Hospital for a sore throat.  R. at 686.  During this approximately hour-long visit, she was alert and oriented to person, place, and time, and was reported as having "a normal mood and affect."  R. at 698-700.  Her suicide screening was negative.  R. at 706.

On April 12, 2018, Ms. Schonfeld presented to Good Samaritan Hospital for exacerbation of her deep vein thrombosis ("DVT"), where she was admitted for two days.  R. at 587.  During this stay, she was consistently alert and oriented to person, place, and time.  R. at 637; 655.  She was also assessed as not having memory

problems, aphasia, or slurred speech.  R. at 642-643.  Her suicide screening was also negative.  R. at 677.

On December 18, 2018, Ms. Schonfeld again presented to Good Samaritan Hospital, this time for leg pain.  R. at 534.  She was discharged approximately three hours later, but during the visit, she was alert and oriented to person, place, and time. R. at 563; 566; 565.

### iv.  Maimonides Medical Center

On April 2, 2018, Ms. Schonfeld presented to the emergency department of Maimonides Medical Center for pain in her lower left leg.  R. at 520.  She was discharged approximately a half-hour later, but during this timeframe, her neurological exam showed "[n]o focal neurological deficiencies."  R. at 518; 522.

### v.  Hematology and Oncology Center at Nyack Hospital

From May 8, 2018 to June 19, 2019, Ms. Schonfeld received DVT follow-up care at the Hematology and Oncology Center at Nyack Hospital.  During her May 8, 2018 visit, Dr. Robert March, M.D. performed a PHQ-9 depression screening questionnaire, with negative results.  R. at 720.  During the May 8 visit as well as subsequent visits on October 15, 2018, February 4, 2019, and June 19, 2019, Dr. March noted that Ms. Schonfeld was oriented to time, place, and situation; exhibited appropriate mood and affect; normal insight; and normal judgment.  R. at 721; 727; 730; 734.

### c.  Consultative Examinations

#### i.  Abraham Kuperberg, Ph.D.

Dr. Abraham Kuperberg, at the behest of the New York State Office of Temporary and Disability Assistance, evaluated Ms. Schonfeld on February 26, 2018. R. at 412.  Ms. Schonfeld drove to the appointment on her own.  R. at 412.  Ms. Schonfeld recounted her background to Dr. Kuperberg, reporting symptoms of disturbed sleep; sedation and poor energy attributed to clonazepam; crying on rare occasions; frustration due to her situation; an unsettled mind; ruminations on the same thoughts over and over again; panic attacks three or four times a week; fear of crowds; and beliefs that others are talking about her.  R. at 413-414.  Ms. Schonfeld also experienced anxiety related to the interview.  R. at 414.  However, Ms. Schonfeld stated that her moods are typically calm now that she takes the right prescription medication combination, which includes alprazolam, clonazepam, zolpidem, and topiramate.  R. at 413.  Ms. Schonfeld did not report manic symptoms, symptoms of depression, suicidal or homicidal ideation, nor racing thoughts.  R. at 413-414.

Ms. Schonfeld stated that she was able to get along well with her co-workers and employers when she was working.  R. at 414.  Ms. Schonfeld is closest to her immediate family and talks to two of her neighbors. R. at 415.  Ms. Schonfeld helps her two children, watches some television, and uses a smart phone to text.  Id.  Ms. Schonfeld is independent in her grooming and hygiene and does her own driving, shopping, cooking, cleaning, and laundry.  Id.

Dr. Kuperberg noted that Ms. Schonfeld appeared well dressed and was able to comprehend and execute simple instructions; there was nothing unusual about her gross or fine motor skills; her speech was normal; she was able to follow the topic of conversation; and she was able to make decisions.  R. at 413-414.  Dr. Kuperberg also observed that Ms. Schonfeld's affect was fixed and constricted but appropriate to content of speech and circumstances; her thinking was logical, coherent, and goal directed; her intellect seemed average; her insight, judgment, immediate and delayed recall, attention, concentration span, and abstract thinking abilities were all good; and she was oriented to time, place, and person.  R. at 414.

Dr. Kuperberg summarized Ms. Schonfeld's functional capacities as follows:

> "The claimant's ability to reason is fair.  Her thinking is fair.  Her memory is good. Her communication ability is good.  Her ability to make usual and customary judgments is fair.  Her ability to adapt emotionally now that she has her moods controlled by proper medication is mildly to moderately impaired.  Her capacity for self-sufficiency is good.  She takes care of herself as well as her special needs' child."  R. at 415.

Dr. Kuperberg also opined that Ms. Schonfeld would be able to manage any monetary awards that might be made on her behalf.  R. at 415.

### ii.    S. Hennessey, Ph.D.

Dr. Hennessey, a medical/psychological consultant for the Social Security Administration, evaluated Ms. Schonfeld's initial claim for disability on March 20, 2018. R. at 95. Dr. Hennessey reviewed Dr. Kuperberg's assessment of Ms. Schonfeld on March 20, 2018 and opined that she had no limitations in understanding, remembering or applying information; no limitations in concentrating, persisting, or maintaining pace; mild limitations in interacting with others; and mild limitations in

adapting or managing oneself. R. at 100. Based solely on Dr. Kuperberg's assessment, Dr. Hennessey noted that despite Ms. Schonfeld's psychiatric impairment, Ms. Schonfeld does not exhibit more than mild limitations in her daily functioning at this time. Id.

### iii.   Melissa Antiaris, Psy.D.

Dr. Melissa Antiaris conducted a consultative psychiatric evaluation of Ms. Schonfeld on behalf of New York State Disability on January 18, 2021. R. at 1073. Ms. Schonfeld was driven to the appointment by her father. R. at 1069. Ms. Schonfeld recounted her previous work history in a dental office and a grocery store but that she had not worked in the last six or seven years due to paranoia and anxiety. Id. Ms. Schonfeld reported that she had been hospitalized many times over the years and had seen a psychiatrist monthly for the last two years. Id. Ms. Schonfeld's relevant medications include clozapine, topiramate, alprazolam, and clonazepam. Id.

Ms. Schonfeld reported that she awakens three times per night; sometimes feels depressed but without suicidal or homicidal ideation; constantly feels anxious, exhausted, and worried about her son; experiences panic attacks usually every night; feels awful; and shuts down. R. at 1069. In addition, Ms. Schonfeld noted that she is always paranoid or worried that people are angry with her, that she may have done something wrong, or about what is going to happen to her. R. at 1070. As a result, she is not social with any friends. R. at 1071.

Ms. Schonfeld also reported difficulty with short-term memory and concentration. Id. Ms. Schonfeld noted that her parents do the shopping, she has an

aide who helps her with her son during the day to send him to school, and needs a cleaning person to help with the cleaning and laundry.  R. at 1071.  However, Ms. Schonfeld is able to dress, bathe, and groom herself; prepare simple meals; do light cleaning; manage her funds; drive locally and take public transportation; enjoyed reading, radio, and television; and had a good relationship with family.  R. 1071.

Dr. Antiaris observed that Ms. Schonfeld was cooperative; appeared appropriately dressed and well groomed; had normal posture and motor behavior; exhibited appropriate eye contact; expressed fluent and clear speech using adequate expressive and receptive language; and had fair insight and judgment.  R. at 1070-1071.  Moreover, Ms. Schonfeld's thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia.  Id.

However, Ms. Schonfeld appeared mildly anxious.  Id.  Dr. Antiaris opined that Ms. Schonfeld's intellectual functioning was in the below-average range.  R. at 1071.  Dr. Antiaris noted that Ms. Schonfeld's attention and concentration were mildly impaired because Ms. Schonfeld could "complete counting and simple calculations correctly" but when asked about serial 7s, Ms. Schonfeld stated, "63, I don't know."  R. at 1070-1071.  Dr. Antiaris also observed that Ms. Schonfeld had mildly impaired recent and remote memory skills because she could recall three of three objects immediately but only two of three objects after a delay and completed five digits forward but none back.  R. at 1071.

Dr. Antiaris opined that Ms. Schonfeld has no limitation in her ability to maintain personal hygiene and be aware of normal hazards; no limitation in her

11

ability to understand, remember, and apply simple directions and instructions; mild limitations in her ability to understand, remember, and apply complex directions and instructions; mild limitations in her ability to sustain concentration and perform a task at a consistent pace, and sustain an ordinary routine and regular attendance at work; moderate limitations in her ability to use reason and judgment to make work-related decisions, to interact adequately with supervisors, coworkers, and the public; and marked limitations in her ability to regulate emotions, control behavior, and maintain well-being.  R. at 1071-1072.

Dr. Antiaris surmised that though Ms. Schonfeld would be able to manage her own funds, Ms. Schonfeld should engage in regular psychological treatment because of psychiatric concerns, specifically panic disorder and generalized anxiety disorder, which may significantly interfere with Ms. Schonfeld's ability to function on a daily basis.  R. at 1072.

**D. <u>The Hearing</u>**

On February 26, 2020, Plaintiff appeared with her then-attorney, Charles Weisner, for a video hearing before ALJ Vincent M. Cascio.  Cherie Plante, a vocational expert ("VE"), was also present.  R. at 76.

**i.   Plaintiff's Testimony**

Plaintiff began by testifying about her biographical details.  At the time of the hearing, Plaintiff was 44 years old.  R. at 81.  Plaintiff's highest level of education is a high school diploma.  R. at 82.  Plaintiff has tried working at a store from time to time, but has issues staying employed due to "phobias."  R. at 82.  While working,

Plaintiff would run out of the store crying due to feelings of anxiety and discomfort arising from the people in the community.  R. at 83.  Because Plaintiff is unable to work, her father assists her financially.  Id.  However, he will soon be unable to assist her since he is retiring.  Id.

Plaintiff is divorced and currently living with her 22-year-old disabled son, with whom she has a good relationship.  R. at 81-82; 85.  Plaintiff also has a daughter and a sister, who she also gets along with, but otherwise does not have any friends. R. at 83-84.

Plaintiff sees a psychiatrist, who prescribes clonazepam and topiramate for bipolar disorder.  R. at 83-84.  Plaintiff experiences panic attacks at night, which cause her to wake two or three times per night.  R. at 88-89.  Additionally, Plaintiff experiences crying spells three times a week.  R. at 88.  Plaintiff has been hospitalized multiple times for drug overdoses on pills.  R. at 90.  Plaintiff denies the use of drugs or alcohol.  R. at 85.

Plaintiff has difficulty concentrating and requires assistance from her father or daughter when reading documents.  R. at 83.  Plaintiff is also unable to follow the plot of movies but enjoys watching television shows.  R. at 86.  However, Plaintiff is unable to navigate computers or the Internet, and only uses her cell phone for calling or texting.  Id.

Plaintiff is only able to take baths as a result of her phobia of showers.  R. at 85.  Plaintiff sometimes cooks but will otherwise eat out.  Id.  Plaintiff hires help to clean the house once a week and will clean in between visits.  Id.

Plaintiff possesses a driver's license and is able to drive herself places, including to the hearing.  R. at 82.  However, Plaintiff becomes nervous and agitated when driving on the highway and will take clonazepam when doing so.  Id.  Plaintiff will only leave the house to visit her parents once every two weeks, or for short periods of time to go shopping at the mall or grocery store.  R. at 85; 88.

### ii.    VE Testimony

The ALJ began by posing his first hypothetical:

> "Please assume a hypothetical person of claimant's age, education and work history. Further assume person has the residual functional capacity to perform a full range of work at all exertional levels. However, the person can never climb ropes, ladders or scaffolds, no exposure to unprotected heights or hazardous machinery and the person can understand, remember and carry out simple, routine, repetitive work related tasks.  Are there any jobs in the national economy for such a person?"  R. at. 91.

The VE responded that the person could perform the functions of a dining room attendant, at a medium exertional level, or the job of cleaner, housekeeper, or router, at a light exertional level.  R. at 92.

The ALJ then adjusted the hypothetical, asking if jobs exist in the national economy for a person who "would be off task 20 percent of the work day in addition to regularly scheduled breaks and the person would be absent four or more times per month."  R. at 92.  The VE simply responded with, "No."  Id.

Plaintiff's attorney declined to cross-examine the VE.  R. at 93.

### E. **The ALJ's Decision**

ALJ Vincent Cascio issued his decision on March 17, 2021.  R. at 33.  At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful activity

("SGA") since October 17, 2017.  R. at 23.  At step two, the ALJ found that Plaintiff suffered from the following severe impairments: "bipolar disorder, adjustment disorder with mixed anxiety and depression."  Id.  The ALJ also noted two non-severe impairments: hyperthyroidism and DVT of the left lower extremity.  Id.

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)."  R. at 23.  The particular listings in question are listings 12.04 and 12.06, regarding mental impairment.  R. at 24.

The ALJ found that Plaintiff had a mild limitation in "understanding, remembering or applying information," a mild limitation in "interacting with others," a moderate limitation with "regard to concentrating, persisting or maintaining pace," and a mild limitation for "adapting or managing oneself."  R. at 24-25.  The ALJ primarily relied on Dr. Kuperberg's and Dr. Antiaris's assessments for this finding.  As Plaintiff's mental impairments did not reach the paragraph B or paragraph C criteria, Plaintiff was found not to satisfy listings 12.04 and 12.06.  R. at 25.

The ALJ then held that Plaintiff had the following RFC:

"[T]o perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can never climb ropes, ladders or scaffolds; and is to avoid all exposure to unprotected heights or hazardous machinery. She can understand, remember and carry out simple, routine, repetitive work related tasks."  R. at 26.

With respect to the evidence proffered in the case, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the

alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. at 30.

The ALJ concluded that there were jobs in the national economy that Plaintiff could perform, taking into account her age, education, work experience, and RFC. R. at 32. Examples included dining room attendant, cleaner-housekeeper, and router. R. at 33. Based on the above, a finding of "not disabled" was made. Id.

## LEGAL STANDARD

### A. Scope of Judicial Review under 42 U.S.C. § 405(g)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation and internal quotations omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotations omitted). Substantial evidence is

16

"relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted). "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (internal citations omitted).

## B. **Standard Governing Evaluation of Disability Claims by the SSA.**

To qualify for disability benefits, an individual must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The SSA's regulations establish a five-step process for determining a disability claim. See 20 C.F.R. § 416.920(a)(4).

> "If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." §§ 404.1520(b), 416.920(b). At step two, the [SSA] will find nondisability unless the claimant shows that he has a "severe impairment." Defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so , the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the [SSA] assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the [SSA] to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy."

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003).

"The applicant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012). "Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999).

In addition to the five-step analysis outlined in 20 C.F.R. § 404.1520, the Commissioner has promulgated regulations governing evaluations of the severity of mental impairments. 20 C.F.R. § 404.1520a. These regulations require application of a "special technique" at the second and third steps of the five-step framework, and at each level of administrative review. Kohler, 546 F.3d at 265. This technique requires the reviewing authority to determine first whether the claimant has a "medically determinable mental impairment." § 404.1520a(b)(1). If the claimant is found to have such an impairment, the reviewing authority must "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)," § 404.1520a(b)(2), which specifies four broad functional areas: (1) understand, remember, or apply information; (2) interact with errors; (3) concentration, persistence, or maintaining pace; and (4) adapting or managing oneself. § 404.1520a(c)(3). If the degree of limitation is rated as "none" or "mild," then the reviewing authority generally will conclude that the claimant's mental impairment is not "severe" and will deny benefits. § 404.1520a(d)(1). If the claimant's mental

impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder.  § 404.1520a(d)(2). If so, the claimant will be found to be disabled.  If not, the reviewing authority will then assess the claimant's residual functional capacity.  § 404.1520a(d)(3).

## DISCUSSION

Plaintiff explicitly states two grounds for reversing the ALJ's decision: (i) that the ALJ did not apply the proper legal standard and (ii) that the ALJ's decision was not based on substantial evidence.  Pl. Mem. at 7.  However, Plaintiff actually raises multiple issues while addressing the record as a whole.  Defendant, in their response, attempts to separate and enumerate these issues.  For purposes of the Court's analysis, the Court will rely primarily on Defendant's enumeration of the issues.  The Court also acknowledges that while each issue is taken in turn below, the issues are all interconnected.

The first argument is that the ALJ committed legal error by making an RFC determination contrary to Social Security Ruling 85-15.  Pl. Mem. at 8-10.  The second is that the ALJ committed a second legal error by making an RFC determination in the absence of supporting expert medical opinion.  Pl. Mem. at 10.  The third is that the ALJ did not fulfill his duty to assist Plaintiff in developing the record.  Pl. Mem. at 12-13.  The fourth is that substantial evidence does not support the ALJ's findings. Pl. Mem. at 14.  The fifth is that the ALJ did not properly weigh the medical opinions.

Pl. Mem. at 14.  For these reasons, Plaintiff argues that the case should be remanded for approval and calculation of benefits, or, in the alternative, for further administrative proceedings.  Pl. Mem. at 14-15.

**A. <u>Whether the ALJ Committed Legal Error by Making an RFC Determination Contrary to Social Security Ruling 85-15.</u>**

Plaintiff begins by arguing that the ALJ committed legal error when he "failed to properly evaluate" Plaintiff's vocationally-relevant limitations under Social Security Ruling ("SSR") 85-15.  Pl. Mem. at 8.  Under this Ruling, Plaintiff argues, if an individual has a mental impairment which causes a substantial loss of ability to respond appropriately to supervision, coworkers, and unusual work situations, a finding of disability would be appropriate.  Pl. Mem. at 10.

In response, Defendant argues that the ALJ expressly evaluated Plaintiff's functioning under the framework of SSR 85-15 by discussing Plaintiff's longitudinal treatment, symptoms, and activities; weighing the medical opinions about Plaintiff's functional limitations; and making an RFC determination that was consistent with the record as a whole.  Memo. of Law in Opp. of Pl's. Mot. for Judgment on the Pleadings and in support of Comm'r's Cross-Mot. For Judgment on the Pleadings at 18 (Dkt. No. 17) ("Opp.").

The Court begins by acknowledging that an ALJ's failure to apply the correct legal standard, including an applicable statutory provision, regulation, or Social Security Ruling, constitutes reversible error, provided that the failure "might have affected the disposition of the case." Cook v. Colvin, No. 13-CV-1946 (TPG), 2015 WL 5155720, at *6 (S.D.N.Y. Sept. 2, 2015).  However, the Court rejects Plaintiff's

contention and adopts Defendant's argument that the ALJ "expressly evaluated" Plaintiff's functioning under Social Security Ruling 85-15.   The ALJ explicitly indicated that he "has taken into account the claimant's limitations in the domain of mental functioning" by utilizing the guidance provided by SSR 85-15.  R. at 32.  The ALJ goes on to summarize the Ruling and finds that the Plaintiff "can fulfill [the basic mental] demands" of competitive work.  Id.

Consequently, the ALJ did not commit a legal error because he did not make an RFC determination without considering SSR 85-15.

**B. Whether the ALJ Committed Legal Error by Making an RFC Determination in the Absence of Supporting Expert Medical Opinion.**

Plaintiff next argues that the ALJ committed legal error when he made an RFC determination in the absence of supporting expert medical opinion because he was, in effect, substituting his own opinion for that of a physician.  Pl. Mem. at 10.  Plaintiff argues that the ALJ made an RFC determination without "meaningful medical opinion that undercuts the reliability of Dr. Lowe's evaluation."  Pl. Mem. at 11.  In support of this, Plaintiff argues that the ALJ improperly rejected Dr. Antiaris's findings of "marked limitations," which supported Dr. Lowe's evaluation, and instead purported to rely on Dr. Kuperberg's assessment, even though Dr. Kuperberg only opined on Plaintiff's emotional adaptions, and not on Plaintiff's other work-related functions.  Pl. Mem. at 11, n.1.

Defendant does not respond directly to the assertion that the ALJ made a determination in the absence of medical opinion, and instead, responds to whether substantial evidence supported the ALJ's decision, as discussed in Part D below.  Opp.

21

at 12-19.  Defendant does, however, argue that "Dr. Kuperberg's identification of impairment only in the area of emotional adaptation did not indicate that other areas were not evaluated."  Opp. at 20.  In support of this, Defendant points to the fact that Dr. Kuperberg "noted Plaintiff had fair to good abilities in other areas like memory, reasoning, thinking, memory, communicating, and making judgments."  Id.

The Court begins by noting that Plaintiff's recitation of the law is correct. "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error."  Molina v. Kijakazi, No. 21-CV-3869 (JLC), 2022 WL 16946823, at *14 (S.D.N.Y. Nov. 15, 2022) (internal quotations omitted).

However, Plaintiff's argument is without merit.  The ALJ did not make his RFC determination based on his own opinions, but instead, relied on (i) the medical records from Monsey Medical Center being "generally unremarkable," (ii) the medical records from Hematology and Oncology Center showing "no overt serious problems," (iii) medical records from emergency room visits at Maimonides Medical Center and Good Samaritan Hospital indicating "no reported complications," and (iv) the consultative evaluations showing "no overt serious symptoms."  R. at 28. Furthermore, contrary to Plaintiff's contention, Dr. Kuperberg's assessment did not solely consider Plaintiff's emotional adaptions.  R. at 415.  Rather, Dr. Kuperberg opined on Plaintiff's other work-related functions when he stated that Plaintiff's

abilities to reason, think, and make usual and customary judgments were "fair," and her memory and communication abilities were "good." Id.

Whether the ALJ properly weighed these medical sources or had substantial evidence from these sources are other issues, but at this stage, it cannot be said that the ALJ committed a legal error by making an RFC determination completely devoid of medical opinions.

## C. **Whether the ALJ Fulfilled His Duty to Assist Plaintiff in Developing the Record.**

Plaintiff argues that the ALJ had a duty to properly develop the record and failed to do so.  In support of this, Plaintiff contends that the ALJ should have reached out to Dr. Antiaris to clarify the nature and severity of the "moderate" limitations, instead of simply declaring that these restrictions were insignificant and rejecting them entirely.  Pl. Mem. at 12-13.

In response, Defendant argues that the ALJ adequately developed the record. An ALJ is only required to fill gaps in the medical record where the facts of the particular case suggest that further development is necessary to evaluate the claimant's condition fairly.  Opp. at 11.  Instead, Defendant argues, it is Plaintiff's obligation to submit all known evidence that relates to whether Plaintiff is disabled. Opp. at 10.

As a preliminary matter, the Court notes that both Plaintiff and Defendant are correct in stating that a hearing on disability benefits is a non-adversarial proceeding, and as a result, the SSA generally has an affirmative obligation to assist a claimant to obtain medical records and develop the administrative record.  Perez v. Charter,

23

77 F.3d 41, 47 (2d. Cir. 1996). The ALJ must develop the record, even when the Plaintiff has counsel. See Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 261-262 (S.D.N.Y. 2016) (citing Perez, 77 F.3d at 47). "It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Sims v. Apfel, 530 U.S. 103, 111 (2000).

Second Circuit precedent has also made clear that "numerous gaps in the administrative record" should prompt the ALJ to pursue additional information regarding the petitioner's medical history. Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). When the ALJ is presented with assessments from a physician that are only one page in length and conclusory in nature, the ALJ should take steps to ask the physician to supplement his findings with additional information. Id. at 80.

This obligation is "enhanced when the disability in question is a psychiatric impairment." See Marinez v. Comm'r of Soc. Sec., 269 F. Supp. 3d 207, 215 (S.D.N.Y. 2017) (quoting Lacava v. Astrue, No. 11-CV-7727 (WHP)(SN), 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012), report and recommendation adopted, No. 11-CV-7727 (WHP), 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012)). The heightened duty derives from the fact that a Plaintiff's "mental illness may greatly impede an evaluator's assessment of a [Plaintiff's] ability to function in the workplace, thus necessitating a more thorough review." Marinez, 269 F. Supp. 3d at 215.

Given this enhanced duty, the Court agrees with Plaintiff that if the ALJ truly believed that Dr. Antiaris did not provide sufficient details in her report, the ALJ should have contacted Dr. Antiaris to clarify the nature of Plaintiff's limitations. The

ALJ repeatedly stated that Dr. Antiaris did not "provide a reason or explanation" for the marked limitations nor does she "explain how such marked limitations would affect the ability to function in a work setting."  R. at 30.  Because Dr. Antiaris's evaluation is one of the few medical sources to support that Plaintiff had a marked limitation, without her explanations, the ALJ did not have the requisite information to "evaluate the [Plaintiff's] condition fairly," nor did the ALJ "investigate the facts and develop the arguments both for and against granting benefits."  Francisco v. Comm'r of Soc. Sec., No. 13-CV-1486 (TPG) (DF), 2015 WL 5316353, at *11 (S.D.N.Y. Sept. 11, 2015); Sims, 530 U.S. at 111.  After all, consultative examinations are often ordered "to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient" to allow for a determination on the claim.  20 C.F.R. § 404.1519a(b).  If the examination adds more ambiguity than it resolves, it is rendered futile.

Consequently, by not investigating facts weighing in favor of granting disability benefits, the ALJ did not fulfill his duty to assist Plaintiff in developing the record.

### D. <u>Whether Substantial Evidence Supported the ALJ's RFC Findings.</u>

Plaintiff argues that substantial evidence does not support the ALJ's findings. In support of this contention, Plaintiff argues that the ALJ did not consider evidence from the doctors who have examined the Plaintiff.  Pl. Mem. at 14.  As discussed below, Plaintiff also argues that, had the ALJ given greater weight to Dr. Lowe's medical opinions, there would be more evidence against the ALJ's determinations. Pl. Mem. at 10.

Defendant argues that the overall record supported a finding that the Plaintiff is able to perform a limited range of simple, repetitive, routine work.  Opp. at 13. This assertion is based on the findings of the consultative examiners, "Plaintiff's course of treatment, the relatively benign exam findings, and her independence in a wide range of activities."  Opp. at 17.

The Court notes that Defendant is correct in stating that substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Biestek v. Berryhill, 139 S. Ct. 1148, 1150 (2019) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  In determining whether the agency's findings were supported by substantial evidence, this Court is required to "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  Selian, 708 F.3d at 417 (internal quotation marks omitted).

Upon examining the entire 1,073-page record, the Court cannot conclude that substantial evidence was available to support the ALJ's decision.  In construing the treatment records as "consistently show[ing] stable examinations," the ALJ relied on the fact that the medical records from emergency room visits and from the Hematology and Oncology Center "showed no overt serious problems."  R. at 27-28. However, these records were written by non-psychiatrists, and often contained only one line of text referencing Plaintiff's neurological status.  See, e.g., R. at 522.

Furthermore, the treatment records from the Plaintiff's most recent psychiatrist, Dr. Weisstuch, are sparse, and are often only one page in length,

26

containing only laboratory values and medication regimens, with no evaluation of Plaintiff's symptoms or complaints. See, e.g., R. at 446; 449; 451; 453; 455; 458; 459; 460; 461. The most detailed treatment records, instead, stem from Plaintiff's hospitalizations prior to the claimed onset date. See, e.g., R. at 325-411; 24-31. The ALJ acknowledged both of these facts, stating "[m]any of the treatment records only pertain to very old inpatient and outpatient psychiatric from 2003-2009" and the records from Monsey Family Medical Center were "duplicate" and contained "no specific remarkable mental status examination findings with annotations essentially only indicating a diagnosis and the next follow up appointment." R. at 27-28.

This lack of detailed records from Plaintiff's treating sources caused the ALJ to rely primarily on opinions of the consultative examiners when making his findings. However, the consultative examinations do not provide substantial evidence in favor of the ALJ's decision because, as discussed in Part E below, (i) the findings of consultative examiners are not dispositive and (ii) the ALJ erroneously cherry-picked findings from the consultative examiners.

Additionally, Plaintiff's ability to perform activities of daily living also does not provide substantial evidence in support of the ALJ's RFC determination on its own. Courts in this Circuit have long recognized that a claimant's ability to perform activities of daily living does not indicate that the claimant does not have a disability. See Mercedes v. Comm'r of Soc. Sec., No. 15-CV-2986 (SJF), 2017 WL 1323789, at *12 (E.D.N.Y. Mar. 28, 2017) (quoting Solsbee v. Astrue, 737 F. Supp. 2d 102, 107 (W.D.N.Y. 2010) ("The mere fact that a plaintiff carried on certain daily activities,

such as grocery shopping, driving a car, or limited walking for exercise does not in any way detract from [Plaintiff's] credibility as to [his or her] overall disability"); see also Miller v. Colvin, 122 F. Supp. 3d 23, 30 (W.D.N.Y. 2015) ("Plaintiff's performance of basic adaptive activities in his own home, or at a store where he has very limited interaction with other people, is not probative of his abilities to … follow work rules, relate to co-workers, use judgment, deal with work stresses, maintain attention and concentration, and interact appropriately with supervisors…").  Here, the ALJ should not have treated Plaintiff's ability to perform some activities of daily living, such as shopping and driving, as dispositive, especially without further clarification of Plaintiff's condition from either Plaintiff's current or past treating psychiatrist or from the consultative examiners.  This is further evidence that the record was not fully developed.

Because of the lack of detailed notes from Plaintiff's treating providers, the ALJ's over-reliance on the findings of the consultative examiners, and the fact that Plaintiff's ability to perform activities of daily living is not dispositive, the Court concludes that substantial evidence did not support the ALJ's RFC findings.

### E. **Whether the ALJ Properly Weighed the Medical Opinions.**

Plaintiff argues that the ALJ brushed aside all evidence that Plaintiff has "very significant work-impairing symptoms."  Pl. Mem. at 14.  In support of this, Plaintiff argues that the doctor best positioned to assess Plaintiff's mental capacities is Dr. Lowe, but the ALJ dismissed Dr. Lowe's observations as neither valuable nor persuasive, despite the record containing no meaningful medical opinion that

undercuts the reliability of Dr. Lowe's evaluation.  Pl. Mem. at 10-11.  In addition, the ALJ rejected Dr. Antiaris's findings of marked limitations and instead focused solely on her findings of moderate limitations.  Pl. Mem. at 11.

In response, Defendant correctly points out that under the Commissioner's regulations eliminating the treating physician rule, an ALJ is not required to defer to the opinions of treating medical sources or give them any particular evidentiary weight.  See 20 C.F.R. § 404.1520c(a)-(c).  Consequently, Defendant argues that the ALJ appropriately found Dr. Kuperberg's opinion to be persuasive, Dr. Antiaris's opinion to be partially persuasive, and Dr. Lowe's opinion to be unpersuasive by "consider[ing] the relevant regulatory factors, adequately explain[ing] how these factors were weighed, and discuss[ing] substantial evidence to support the weight that should be accorded to each of the medical opinions."  Opp. at 19-21.

The Court notes that under the regulations replacing the treating physician rule, the ALJ must consider all medical opinions based on (i) supportability, (ii) consistency, (iii) relationship with the claimant, (iv) specialization, and (v) other relevant factors.  20 C.F.R. § 404.1520c(c).  Because supportability and consistency are the most important factors, the ALJ is required to explain how he considered those factors.  20 C.F.R. § 404.1520c(b)(2).  The "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)", the more persuasive the medical opinions or prior administrative medical finding(s) will be.  20 C.F.R. § 404.1520c(c)(1).  Evaluating supportability "is an inquiry geared toward assessing how well a medical source

29

supported and explained their opinion(s)." Navedo v. Kijakazi, No. 20-CV-10013 (JLC), 2022 WL 2912986, at *7 (S.D.N.Y. July 25, 2022) (internal quotations omitted). The greater the consistency between a particular medical source/opinion and the other evidence in the medical record, the more persuasive that medical opinion is. 20 C.F.R. § 404.1520c(c)(2). "The failure to properly consider and apply supportability and consistency are grounds for remand." Navedo, No. 20-CV-10013 (JLC), 2022 WL 2912986, at *7 (internal quotations omitted).

Although the treating physician rule may no longer be in effect, this Court, when considering the application of the new regulations, has concluded that "the factors are very similar to the analysis under the old [treating physician] rule." Velasquez v. Kijakazi, No. 19-CV-9303 (DF), 2021 WL 4392986, at *20 (S.D.N.Y. Sep. 24, 2021) (quoting Dany Z. v. Saul, 531 F. Supp. 3d 871, 885 (D. Vt. 2021)); see also Cuevas v. Comm'r of Soc. Sec., No. 20-CV-502 (KMW) (KHP), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) ("the essence of the rule remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar"). When considering the relationship with the claimant, for instance, the ALJ must consider (i) length of the treating relationship; (ii) frequency of examinations; (iii) purpose of the treatment relationship; (iv) extent of the treatment relationship; and (v) examining relationship. 20 C.F.R. § 1520c(c)(3)(i)-(v).

The Court rejects the first half of Defendant's contention that the ALJ "considered the supportability factor" and "explained how he weighed the consistency

factor" regarding Dr. Lowe's opinions.  Opp. at 21.  The ALJ may have "considered" supportability; however, he did not explicitly articulate a rationale for his supportability determination, only a rationale for his consistency determination.  The ALJ stated that he found Dr. Lowe's opinion unpersuasive because "the issue of being disabled or unable to work is an issue reserved to the Commissioner" and because "her opinion is not consistent with the benign treatment notes."  R. at 27-28.  While the second reason comments on consistency, the first reason does not comment on supportability.  Though the ALJ is correct that Dr. Lowe made a conclusory statement that Plaintiff's illness is disabling, she also provided some objective medical evidence from Plaintiff's medical history (noting that Plaintiff has acted impulsively with poor judgment), along with supporting explanations (identifying Plaintiff's stressors as caring for her son, conflicts with her daughter, and financial difficulties), R. at 1064-1066.  The ALJ did not articulate his supportability determination of Dr. Lowe's opinion, and this, by itself, is grounds for remand.

Nor did the ALJ fully articulate his supportability and credibility determinations of the findings of Plaintiff's other providers.  R. at 28.  When discussing Dr. Weisstuch's findings, the ALJ only states that the treatment notes "provide no specific remarkable mental status examination findings" but that the examinations do show that Plaintiff was "consistently cooperative, well groomed, alert and in no acute distress."  R. at 28.  The ALJ does not explicitly explain that, in this instance, he is seemingly granting more weight to the consistency factor than the supportability factor.  In addition, the ALJ only discusses the treatment records from

emergency room visits as well as the Hematology and Oncology Center to point out that they "showed no overt serious problems and consistent reports of normal psychiatric examinations." R. at 28.  This language again, appears as though the ALJ is weighing the consistency factor over the supportability factor, but the ALJ does not unequivocally state this.

Moreover, when considering the weight to give a medical opinion, the Second Circuit has frequently "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." Estrella v. Berryhill, 925 F.3d 90, 98 (2d Cir. 2019) (quoting Selian, 708 F.3d at 419).  Consultative exams are often brief, performed without the benefit of or review of a Plaintiff's medical history and, at best, only give a glimpse of the Plaintiff on a single day.  See Tankisi, 521 F. App'x at 34 (internal quotations omitted).  This is especially important in the context of mental illnesses, where "a one-time snapshot of a [Plaintiff's] status may not be indicative of her longitudinal mental health." Estrella, 925 F.3d at 98.  It is common for Plaintiffs to experience cycles of improvement and debilitating symptoms are a common occurrence, and as a result, it is erroneous for an ALJ to "pick out a few isolated instances of improvement and treat them as a basis for concluding a Plaintiff is capable of working." Estrella, 925 F.3d at 97 (quoting Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014)).  Based on this precedent, the ALJ's over-reliance on consultative examinations to determine Plaintiff's medical condition is unwarranted.

In addition, even if the ALJ had been justified in relying on these examinations, the ALJ did not clearly articulate his supportability and consistency

32

findings with respect to Dr. Kuperberg's findings.  R. at 29-30.  Though the ALJ states that Dr. Kuperberg's opinion is persuasive because "it was based on his thorough examination" and was "also consistent with the generally stable clinical record," the ALJ does not explicitly explain how he determined that Dr. Kuperberg's examination was thorough, and thus, provided evidence for the supportability factor.  R. at 29.

Furthermore, the ALJ impermissibly cherry-picked evidence from Dr. Antiaris's consultative examination.  An ALJ may not "cherry pick" evidence, defined as improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source.  See Javon W. v. Comm'r of Soc. Sec., No. 6:20-CV-06730 (EAW), 2022 WL 4363786, at *3 (W.D.N.Y. Sep. 21, 2022) (internal quotations omitted); see also Guadalupe v. Comm'r of Soc. Sec., No. 20-CV-4522 (GBD)(RWL), 2021 WL 8323596, at *13 (S.D.N.Y. Dec. 16, 2021) ("[A]n ALJ may not selectively favor opinions, or portions of an opinion, that support his determination and ignore opinions or facts that do not").

Here, the ALJ described Dr. Antiaris's findings of "moderate," "mild," and "no" limitations as being consistent with the record while, at the same time, describing Dr. Antiaris's findings of "marked" limitations in the ability to regulate emotions, control behavior, and maintain well-being as unpersuasive because "she does not provide a reason or explanation."  R. at 30.  The inconsistency of the ALJ's simultaneous reliance and rejection on Dr. Antiaris's findings concerning Plaintiff's limitations constitutes an error.  If Dr. Antiaris's opinion was unpersuasive for the purpose of determining Plaintiff's RFC because of a lack of reasoning, the ALJ failed

33

to explain the basis of his reliance on Dr. Antiaris's findings of the moderate, mild, and no limitations, which similarly did not contain specific reasoning.  R. at 30; 1071-1072.  Moreover, if the ALJ found Dr. Antiaris's opinions to be lacking in reasoning, he does not explain why he did not find Dr. Kuperberg's opinions to also be lacking in reasoning, as Dr. Kuperbeg's opinion followed the same format as Dr. Antiaris's opinion by first describing Plaintiff's history and mental status examination, and then providing functional capacities without explicitly referencing back to the mental status examinations in making their functional capacity determinations.  See R. at 412-415; 1069-1072.

For the reasons set forth above, the ALJ did not properly weigh the medical sources because he did not clearly articulate his supportability and credibility determinations for the majority of the medical opinions in the record, and impermissibly cherry-picked evidence from Dr. Antiaris' examination.

**F.** **Whether the Court Should Remand for Approval and Calculation of Benefits or for Further Administrative Proceedings.**

Plaintiff requests a remand for approval and calculation of benefits, or in the alternative, for further administrative proceedings.  Pl. Mem. at 14-15.  Defendants argue that Plaintiff has failed to show any basis to reverse the ALJ's decision and failed to show that a remand for calculation of benefits is warranted.  Opp. at 23.

The Court notes that Defendant's recitation of the law is correct.  Remand for calculation of benefits is "appropriate when the record provides persuasive evidence of total disability that renders any further proceedings pointless."  Stacey v. Comm'r of Soc. Sec. Admin., 799 F. App'x 7, 11 (2d Cir. 2020) (internal quotations omitted).

Here, the record does not contain such persuasive proof of disability after the alleged onset date that remand would serve no purpose.

However, remand for further administrative proceedings is appropriate where "there are gaps in the administrative record or the ALJ has applied an improper legal standard." Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999). Here, as noted above, the ALJ did not fulfill his duty to assist the Plaintiff in developing the record, did not base his opinion on substantial evidence, nor did he properly weigh the medical sources. These errors warrant remand for further proceedings.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion (Dkt. No. 13) is **GRANTED**, and the Commissioner's motion (Dkt. No. 17) is **DENIED**.

SO ORDERED.

DATED:      New York, New York
            March 24, 2023

                              _Jennifer E. Willis_
                              JENNIFER E. WILLIS
                              United States Magistrate Judge